## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-02305-STV

TAMMY MARTIN and
BARRY MARTIN,
individually and on behalf of their minor children
Minor Child N and Minor Child J,

      Plaintiffs,

v.

CHINESE CHILDREN ADOPTION INTERNATIONAL,

      Defendant.

_____

## ORDER
_____

Entered By Magistrate Judge Scott T. Varholak

      This matter is before the Court on Defendant Chinese Children Adoption International's Motion to Dismiss (the "Motion"). [#41] The parties have consented to proceed before the undersigned United States Magistrate Judge for all proceedings, including entry of a final judgment. [##16, 18] The Court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND[1]

After their six children reached adulthood, Plaintiffs Tammy and Barry Martin (collectively, the "Martins") decided to adopt additional children.  [#38, ¶ 22]  In March 2014, the Martins adopted Minor Child N ("N") from China through Bethany Christian Services.  [*Id.* ¶ 24]  The adoption of N was a positive experience for the Martins and for N, and the Martins decided to adopt another child as a sibling for N.  [*Id.* at ¶ 25]  The Martins wanted to adopt another child from China due to their knowledge of the adoption process there, and the racial affinity that would be shared between N and the second adopted child.  [*Id.* at ¶ 26]

On September 18, 2015, the Martins adopted Minor Child L ("L") through Defendant Chinese Children Adoption International ("CCAI") from the Dalian Social Welfare Institute orphanage in China.  [*Id.* at ¶ 27]  CCAI is an adoption agency that matches "waiting children" with applicants for a fee.  [*Id.* at ¶¶ 12-13]  A waiting child is a child that has been evaluated by the agency and can be matched and subsequently adopted by a prospective adoptive applicant.  [*Id.* at 2 n.1]  CCAI provides certain information on a waiting child to the applicant, including photographs, a physical examination, medical information relating to the child's condition, if available, basic developmental information, and background information composed by the orphanage, based on the child's personality, preferences, history in the orphanage, and daily routine.

---

[1] The facts are drawn from the allegations in Plaintiffs' Second Amended Complaint and Jury Demand  [#38], which must be taken as true when considering a Rule 12(b)(6) motion to dismiss.  *Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011)).

[*Id.* at ¶ 18]  CCAI explained on its website that waiting children "range in age from about 1 year to 13 years at the time of match."  [*Id.* at ¶ 19]

CCAI representatives represented to the Martins that L's date of birth is July 3, 2003, and that he was 12 years old at the time of adoption.  [*Id.* at ¶ 29]  Plaintiffs allege that L was in fact at least 15-16 years old at the time.  [*Id.* at ¶ 30]  CCAI did not investigate L's true age and, according to the Second Amended Complaint, had they done so, they would have realized that L was at least 15-16 years old.  [*Id.* at ¶¶ 30-32]  Plaintiffs contend that they would not have adopted L if CCAI had accurately represented his age. [*Id.* at ¶ 101]

L joined the household in September 2015.  [*Id.* at ¶ 36]  Within one month of L moving into the Martin house, N's hair began to fall out, he had a bloody stool, he stopped eating, and he was continually upset, crying, and banging his head.  [*Id.* at ¶ 37]  N ultimately went bald at the age of 5.  [*Id.* at ¶ 38]  N would also run into the Martins' bedroom during the night to get into bed with them.  [*Id.* at ¶ 65]

In 2015, the Martins also sought to adopt a child with special needs.  [*Id.* at ¶ 39] In January 2016, the Martins finalized the adoption of Minor Child J ("J") through CCAI. [*Id.* at ¶ 42]  When the Martins adopted J, employees from CCAI represented that J had a diagnosis of hydrocephalus and cerebral palsy.  [*Id.* at ¶ 43]  CCAI did not give any information to the Martins regarding the underlying cause of J's hydrocephalus and did not indicate whether he had a shunt.  [*Id.* at ¶ 47]

The Martins noticed a scar on J's head.  [*Id.* at ¶ 48]  On multiple occasions, the Martins asked representatives from CCAI, including Judy Winger, a social worker, about what had caused the scar.  [*Id.* at ¶¶ 28, 48-49]  Ms. Winger responded by stating that

CCAI would look into the issue.  [*Id.* at ¶ 49]  Ms. Winger told the Martins that CCAI would "look into it" and, finally, told the Martins that the orphanage had said that J had not received surgery.  [*Id.*]  Ms. Martin questioned how that information could be accurate, given the visible scar on the back of J's head.  [*Id.* at ¶ 51]  Nonetheless, CCAI did not disclose what caused the scar and did not conduct any investigation into the scar or J's medical history.  [*Id.* at ¶¶ 50, 52]  Prior to the finalization of J's adoption, CCAI discouraged the Martins from conducting any of their own independent investigation; CCAI representative Sheila King told the Martins not to contact organizations other than the orphanage because doing so could harm CCAI's operations in China.  [*Id.* at ¶¶ 53-54]

After adopting J, Ms. Martin began to conduct her own investigation on hydrocephalus.  [*Id.* at ¶ 55]  As part of this investigation, Ms. Martin learned about a Hong Kong not-for-profit organization called MedArt that supports Chinese orphans needing medical care.  [*Id.* at ¶¶ 55-56]  On MedArt's website was J's image and a brief description detailing the fact that J had previously undergone brain surgery.  [*Id.* at ¶ 57]  In 2018, Ms. Martin contacted MedArt and representatives told Ms. Martin that J had surgery in 2011 to remove a brain tumor.  [*Id.* at ¶ 58]  Plaintiffs allege that if CCAI had investigated J's medical history, discovered the brain tumor, and informed the Martins of this tumor, the Martins could have notified J's neurologist of the surgery in 2016 instead of 2018.  [*Id.* at ¶ 59]  As a result of this delay, J has suffered further medical complications, and is now going blind.  [*Id.* at ¶ 60]

After beginning to live with the Martins, J would wake up screaming and crying. [*Id.* at ¶ 64]  J complained of pain in his buttocks.  [*Id.* at ¶ 66]  The Martins believed the

pain was a result of J's abuse at a Chinese orphanage, but J later developed viral warts around his anus. [*Id.* at ¶¶ 66-67]

The Martins discovered that L's alarm would go off every night at 3 a.m., at which time L would rape his adoptive brothers. [*Id.* at ¶¶ 68-69] The Martins confronted L, who admitted to the abuse. [*Id.* at ¶ 70] On March 19, 2016, the Martins took L to a behavioral center, where L told his therapist that he had strong sexual urges that he could not control, and that he would continue the abuse of his adoptive brothers if given the chance. [*Id.* at ¶¶ 71-72] L subsequently told the Martins that he had been raped, prostituted, and forced to watch pornography at the orphanage [*Id.* at ¶74] According to the Second Amended Complaint, the orphanage "had a reputation for prostituting the children in its care to adults." [*Id.* at ¶ 104] According to Plaintiffs, prior to the adoption, CCAI did not investigate L's background or sexual history and "did little if any investigation into the conditions at the orphanage where [L] was housed while a 'waiting child.'" [*Id.* at ¶¶ 33-35] Had CCAI investigated and accurately reported L's sexual history, the Martins would not have adopted him. [*Id.* at ¶ 102]

In March 2016, L was charged with two counts of sexual battery and sent to a juvenile detention center. [*Id.* at ¶ 73] While housed in juvenile detention, L underwent a psychosexual assessment by a counseling service, which revealed that L was at a high risk of reoffending and needed specialized residential therapy for his sexually maladaptive behaviors. [*Id.* at ¶¶ 86-87] L admitted that he had been removed from foster care in China for sexually acting out with another child at the age of 5 or 6 and admitted to being sexually active with adults in China since the age of 11. [*Id.* at ¶¶ 80-81] Plaintiffs allege that L "established a pattern of sexually exploiting multiple children including his two

adopted brothers as well as another boy, when he was age 11." [*Id.* at ¶ 84]  L was assessed to be at high risk to reoffend and remains in custody as a result of his abuse of his adoptive brothers. [*Id.* at ¶¶ 85, 88]

The Martins notified CCAI of L's crimes. [*Id.* at ¶ 89]  CCAI denied having knowledge of L's sexual history. [*Id.* at ¶ 90]  In response to Ms. Martin asking him to help the Martins understand what had happened to L, CCAI's President, Joshua Zhong, flew to Indianapolis and met with Ms. Martin and L at L's juvenile detention facility. [*Id.* at ¶¶ 91-92]  Mr. Zhong interviewed L, and L eventually recanted his admissions regarding his sexual history. [*Id.* at ¶ 94]  According to Plaintiffs, Mr. Zhong's "manipulative interview" of L delayed the reporting of accurate information about the sexual abuse to L's therapist. [*Id.* at ¶ 95]  This information would have been beneficial in the trauma therapy for all three children. [*Id.* at ¶ 96]

Plaintiffs allege that the Martins were forced to sell their home—quickly and at a loss—and move across the country in an effort to help N and J cope with the abuse they had suffered, including moving away from the traumatic memories associated with the home. [*Id.* at ¶¶ 107, 108]  The Martins lost their health care business, and both N and J have post-traumatic stress disorder ("PTSD"), attachment disorder, and numerous other mental and physical health conditions, including irritability, sleep disturbance, rage, and anxiety. [*Id.* at ¶¶ 109-13]

The Martins, individually and on behalf of N and J, filed the instant action on August 13, 2019. [#1]  Plaintiffs filed the First Amended Complaint and Jury Demand on October 29, 2019. [#21]  On April 8, 2020, this Court granted CCAI's Motion to Dismiss the First

Amended Complaint, but granted Plaintiffs leave to file a Second Amended Complaint. [#32]

On May 5, 2020, Plaintiffs filed their Second Amended Complaint.  [#38]  Through the Second Amended Complaint, Plaintiffs assert the following claims against CCAI:  (1) a negligent misrepresentation claim by all Plaintiffs, based on CCAI's alleged failure to provide accurate information about L's sexual history and for misrepresenting his age; (2) a misrepresentation claim by the Martins and J, based on CCAI's failure to inform the Martins about J's medical history; (3) a negligence claim by the Martins and J, based on CCAI's failure to investigate J's medical history; (4) a negligence claim by all Plaintiffs, based on CCAI's failure to investigate L's age and sexual history;[2] (5) a fraud claim by all Plaintiffs alleging that Mr. Zhong intimidated L into recanting L's admission of sexual abuse and then represented to Ms. Martin that L had lied about his sexual abuse; and (6) a fraud claim by all Plaintiffs, alleging that Ms. King fraudulently told Ms. Martin that communications with organizations other than the orphanage would harm CCAI's operations in China.  [*Id.* at 13-17]  Plaintiffs seek compensatory damages, attorneys' fees and costs, and injunctive relief requiring CCAI to implement protocols to "stop the disregard of the safety of clients and their families," among other relief.  [*Id.* at 18]

CCAI filed the instant Motion on May 19, 2020, arguing that the Second Amended Complaint should be dismissed in its entirety pursuant to Federal Rule of Civil Procedure

---

[2] Plaintiffs' negligence claim also alleges that "CCAI, through [Mr.] Zhong, actively misled and manipulated [L] during [Mr.] Zhong's interview of [L] in Indiana."  [#38, ¶ 145] Because neither party addresses this allegation in their briefing, the Court similarly does not address this allegation in its consideration of the Motion.

12(b)(6).  [*See generally* #41]  Plaintiffs have filed a response [#45], and CCAI has filed a reply [#48].

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Cassanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).   Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).  "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## III.   ANALYSIS

CCAI argues that each of Plaintiffs' claims must be dismissed with prejudice.  [*See generally* #41]  CCAI argues that Plaintiffs' negligence and negligent misrepresentation claims are barred by contract.  [#41 at 6-7]  CCAI further maintains that Plaintiffs have failed to plausibly allege any of their claims.  [*Id.* at 7-20]  The Court addresses each argument in turn.

### A.   For purposes of the Instant Motion, CCAI Has Conceded That the Contracts Do Not Bar Plaintiffs' Claims

CCAI first argues that the contracts between the Martins and CCAI bar Plaintiffs' negligence and negligent misrepresentation claims.[3]  [*Id.* at 6-7]  The adoption placement agreements between the Martins and CCAI related to the adoptions of L and J each provide as follows:

> We agree to hold CCAI harmless legally for any medical, developmental, psychological and mental problems of my/our adopted child, minor or major, whether or not such conditions were previously disclosed or reasonably discoverable by CCAI or its representatives.  We have conducted adequate investigation into the status of our adopted child to the extent that we have deemed reasonably necessary, including consulting with appropriate medical professionals at our discretion.

---

[3] CCAI attached the contracts to its Motion.  [#41-1; #41-2]  Plaintiffs responded to the Motion and questioned neither the authenticity of the contracts nor the Court's ability to consider the contracts in resolving the Motion pursuant to Rule 12(b)(6).  [#45 at 18-23]  Moreover, the contracts are central to the negligent misrepresentation claims as they establish the business transaction referred to in the Second Amended Complaint [#38, ¶¶ 13, 115, 123] and required for a negligent misrepresentation claim.  *See Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009) ("identifying first element of a negligent misrepresentation claim as defendant supplying false information in a business transaction).  As a result, even though Plaintiffs did not attach the contracts to the Second Amended Complaint, the Court may consider the contracts.  *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) ("[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity" (quotation omitted).).

9

[#41-1, ¶ 6; #41-2, ¶ 6]  According to CCAI, this language bars Plaintiffs' negligence and negligent misrepresentation claims.  [#41 at 6-7]

In response, Plaintiffs argue that these agreements are not enforceable under Colorado law.[4]  [#45 at 18-22]  "Under Colorado law, exculpatory agreements have long been disfavored and it is well-established that such agreements cannot shield against a claim for willful and wanton conduct, regardless of the circumstances or intent of the parties."  *Brigance v. Vail Summit Resorts, Inc.*, 883 F.3d 1243, 1249 (10th Cir. 2018) (quotations and citations omitted).  Nonetheless, Colorado "does not categorically prohibit the enforcement of contracts seeking to release claims of negligence."  *Id.* at 1249-50 (quotation omitted).  In determining the enforceability of an exculpatory agreement under Colorado law, courts are to consider four factors:  "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language."  *Id.* at 1250 (*quoting Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981)).  "[I]f an exculpatory agreement satisfies any of the four factors, it must be deemed unenforceable."  *Id.*  "Although consideration of these factors is generally sufficient to determine the enforceability of exculpatory agreements, the Colorado Supreme Court has clarified that other public policy considerations not necessarily encompassed in the *Jones* factors may invalidate exculpatory agreements."  *Id.* (quotation omitted).

---

[4] CCAI is a Colorado corporation with its principle place of business in Colorado.  [#38, ¶ 6]  Though Plaintiffs resided in Indiana at the time of the adoptions [*id.* at ¶¶ 23, 64], both parties argue for the application of Colorado law [#41 at 7; #45 at 5; #48 at 6].  The Court thus will likewise apply Colorado law.

CCAI has not responded to Plaintiffs' arguments regarding the application of these factors to the exculpatory provisions of the adoption placement agreements. [*See* #45 at 18-22; #48 at 2 n.1]  While CCAI notes that it "does not waive its contract defense," it maintains that "to the extent the Court deems the liability waivers of the Martins' adoption contracts unenforceable, their claims remain infirm."  [#48 at 2 n.1]  Given the complexity of the *Jones* analysis and CCAI's failure to engage in such an analysis, the Court deems the above-quoted statement as CCAI's concession of the contract waiver argument for purposes of the instant Motion, but a preservation of the argument if this case proceeds beyond the motion to dismiss stage.  *See S. Denver Anesthesiologists, PC v. Oblachinski*, No. CIV 06-CV-02425-REB, 2007 WL 2255123, at *1 (D. Colo. Aug. 3, 2007) (refusing to consider "cursory, unsupported, or otherwise inadequately briefed arguments").  Accordingly, to the extent the Motion argues that the contract bars Plaintiffs' negligence and negligent misrepresentation claims, the Motion is DENIED.

### B.    History of "Wrongful Adoption" Claims

"The term wrongful adoption is somewhat unfortunate."  *Meeker v. McLaughlin*, No. 17-CV-5673 (SN), 2018 WL 3410014, at *4 (S.D.N.Y. July 13, 2018).  As is the present case, "wrongful adoption cases generally involve a fact pattern in which adoption agencies or other informational gatekeepers [are alleged to have] misle[d] adoptive parents about their new child's medical or social history."  *Id.*  "Depending on whether this misconduct was intentional or negligent, wrongful adoption claims sound in fraud, negligence, and/or intentional infliction of emotional distress."  *Id.*; *see also Wolford v. Children's Home Soc'y of W. Va.*, 17 F. Supp. 2d 577, 581-83 (S.D. W. Va. 1998)

(collecting cases addressing misrepresentation or concealment of an adopted child's medical and social history).

Ohio was the first state to recognize a tort claim brought by adoptive parents against an adoption agency. *Wolford*, 17 F. Supp. 2d at 581 (citing *Burr v. Bd. of Cnty. Comm'rs*, 491 N.E.2d 1101 (Ohio 1986)). In that case, adoption agency personnel represented that the adopted infant was "a nice, big, healthy baby boy" who was born to a "working mother . . . who was living with her parents," but the personnel actually knew that the child was born to a patient in a mental hospital and had records showing that the child suffered a fever at birth, was developing slowly, may have low intelligence, and was at risk of disease. *Burr*, 491 N.E.2d at 1103-05. After adoption, the child suffered from a variety of physical and mental ailments. *Id.* The parents eventually obtained the child's records, discovered that they had been deceived, and successfully brought a fraud claim against the agency. *Id.* at 1104. The jury's verdict was affirmed by the Ohio Supreme Court. *Id.* at 1109.

Three years later, Wisconsin held that an adoption agency could be found liable for negligence by misinforming prospective parents about the risk of an adopted child contracting Huntington's Disease. *Meracle v. Children's Serv. Soc'y,* 437 N.W.2d 532 (Wis. 1989). Since then, a majority of jurisdictions that have considered the question have extended traditional fraud and negligence theories to provide relief to parents who sought to bring claims against adoption agencies for failure to disclose accurate histories of their adopted children. *See Dresser v. Cradle of Hope Adoption Ctr., Inc.*, 358 F. Supp.2d 620, 639 (E.D. Mich. 2005) (collecting cases). In general, in the few cases in which claims were rejected, the court did not find the adoption agency immune or find

that no duty existed; rather, the claims failed for want of proof of one or more of the elements of a traditional tort.  *See id.* (collecting cases).  With this history in mind, the Court turns to Plaintiffs' claims.

## C.    Negligence Claims

"To recover on a negligence claim, a plaintiff must establish that (1) the defendant owed the plaintiff a legal duty of care; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach caused that injury."  *N.M. ex rel. Lopez v. Trujillo*, 397 P.3d 370, 374 (Colo. 2017).  A plaintiff's damages are limited to damages that are "the natural and probable result of the injury sustained by virtue of the tortious act."  *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 872 (Colo. 2002) (quotation omitted). That is, the damages must be reasonably foreseeable.  *See id.*  "The exact or precise injury need not have been foreseeable, but it is sufficient if a reasonably careful person, under the same or similar circumstances, would have anticipated that injury to a person in the plaintiff's situation might result from the defendant's conduct."  *Id.* (quoting C.J.I.- Civ.3d 9:30).  Though damages from negligence often have multiple causes, "the chain of causation . . . may be so attenuated that no proximate cause exists as a matter of law." *Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, 412 P.3d 751, 762 (Colo. App. 2015) (quotation omitted).

### 1.    Duty and Breach

CCAI first contends that Plaintiffs have not plausibly pled that CCAI owed Plaintiffs a duty of care.  [#41 at 13]  "Whether a defendant owes a duty to a plaintiff is the threshold element [of a negligence claim] because absent a duty, the question of whether the other elements can be satisfied does not arise."  *N.M.*, 397 P.3d at 374.  In making this

determination, the Colorado Supreme Court has distinguished between a defendant's failure to act (nonfeasance) and claims based upon active misconduct (misfeasance). *Id.* Here, the parties appear to agree that Plaintiffs' negligence claims are premised upon CCAI's nonfeasance. [#41 at 13-14 ("Both of [P]laintiffs' negligence claims . . . are premised on allegations that CCAI failed to conduct reasonable investigations into [J and L], that it failed to provide accurate information about these children to the Martins and that such failures resulted in harm"); #45 at 12-13 (agreeing that the court should look to nonfeasance precedent to determine the existence of the duty)]

"In nonfeasance cases the existence of a duty has been recognized only during the last century in situations involving a limited group of special relationships between parties." *N.M.*, 397 P.3d at 374 (quotation omitted). Such relationships are predicated on a definite relation between the parties that is of such a character that social policy justifies the imposition of a duty to act. *Id.* (quotation omitted). "A duty to act might arise, for example, in a situation in which two parties are in a relationship of dependence or mutual dependence." *Id.* To date, Colorado courts have only recognized a legal duty owed to a plaintiff in a nonfeasance case in six specified types of relationships: common carrier/passenger, innkeeper/guest, possessor of land/invited entrant, employer/employee, parent/child, and hospital/patient.[5]    *Rocky Mountain Planned*

---

[5] CCAI argues that *Wagner* held that allegations of nonfeasance "necessarily require a plaintiff to show the existence of an *enumerated* special relationship" and that these six special relationships are the "only" types of special relationships that qualify. [#48 at 7, 8 (emphasis added)] To the contrary, *Wagner* made clear that "in a nonfeasance case, the existence of a duty has been recognized *primarily in* cases involving a limited group of special relationships between the parties" and that "*[t]o date*," only these six types of special relationships have been recognized. 467 P.3d at 295 (emphasis added). The *Wagner* court thus left the door open to finding liability for nonfeasance both for additional types of special relationships and outside the context of "special relationships." *See also*

*Parenthood, Inc. v. Wagner*, 467 P.3d 287, 295 (Colo. 2020).  The parties agree that none of these applies here.  [#41 at 13-14; #45-1 at 2-3]

Plaintiffs argue that this legal duty should be extended to the relationship at issue here: adoption agency/prospective adoptive parent.  [#45 at 12-13; #45-1 at 1-4]  Neither party has cited Colorado caselaw addressing this issue, nor has the Court's independent research revealed such a case.  Because there is not clear guidance from the Colorado Supreme Court, this Court "exercising diversity jurisdiction must make an *Erie* guess as to how that court would rule."[6]  *Lynch v. Olympus Am., Inc.*, No. 18-cv-00512-NYW, 2018 WL 5619327, at *6 (D. Colo. Oct. 30, 2018) (citing *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th Cir. 2005)).

Given the lack of guidance from Colorado courts, the Court looks to other jurisdictions' wrongful adoption jurisprudence for guidance in making its *Erie* guess.  *See Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1228 (10th Cir. 2001) (noting that in making an *Erie* guess, the court is "free to consider all resources available, including decisions of [the state's] courts, other state courts and federal courts, in addition to the general weight and trend of authority").  Although numerous courts have recognized claims for fraud and negligent misrepresentation in the adoption context, *see Wolford*, 17 F.Supp.2d at 581-82 (collecting cases), courts have reached varying decisions with

---

*Univ. of Denver v. Whitlock*, 744 P.2d 54, 58 n.3 (Colo. 1987) (observing that, under the Restatement (Second) of Torts, "[s]pecial relationships are not the only situations that give rise to a duty to take affirmative action for another's aid or protection" but finding it unnecessary to decide whether those other situations "would be recognized in Colorado").
[6] In *Erie R. Co. v. Tompkins*, the United States Supreme Court held that, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state" as "declared by its Legislature in a statute or by its highest court in a decision."  304 U.S. 64, 78 (1938).

regard to the scope of the duty, if any, an adoption agency owes to prospective adoptive parents independent of the adoption agency's obligation not to misrepresent material facts to the prospective adoptive parents.[7]

Courts applying California law have held that "[a]doption agencies . . . are not liable for mere negligence in providing information regarding the health of a prospective adoptee." *Ann Marie N. v. City & Cnty. of San Francisco*, No. A093454, 2001 WL 1261958, at *4 (Cal. Ct. App. Oct. 22, 2001) (quotation omitted).   In refusing to overrule that precedent and permit negligence claims, the California Court of Appeal observed that "[t]he [California] Legislature ha[d] not overruled [the precedent prohibiting claims of negligence] even as it ha[d] demonstrated an intent to provide prospective adoptive parents with as much information as possible." *Id.* at *5.   The court acknowledged that the parties and amicus curiae had "advanced policies for and against imposing liability on adoption agencies for negligence," but found that those polices "deserve[d] consideration from a legislative body [rather than the court] so that the issue [could] be resolved for the greatest good of children waiting for adoption and adoptive parents." *Id.*

In *Gibbs v. Ernst*, the Pennsylvania Supreme Court extended the tort of negligent misrepresentation to the adoption context.   647 A.2d 882, 891 (Pa. 1994).   The *Gibbs*

---

[7] Here, Plaintiffs have brought negligence claims separate and distinct from their negligent misrepresentation claims.   Although CCAI does not appear to contest the availability of negligent misrepresentation claims where the adoption agency negligently conveys false information to prospective adoptive parents [#41 at 7-12], CCAI argues that it did not have an independent duty to investigate background information about the adopted children and then convey that information to prospective adoptive parents [*id.* at #13-14]—the basis for Plaintiffs' negligence claims.   [*See* #38, ¶¶ 132 (alleging that CCAI had a duty to "reasonably investigat[e] the circumstances of [J's] medical history"), 142 (alleging that CCAI had a duty to "reasonably investigat[e] the circumstances of [L's] background")]

court reasoned that an adoption agency must disclose material matters known to it to prospective adoptive parents, in part, because "[t]he adoption agency-adopting parent connection is, or should be, one of trust and confidence, differing significantly from a business arrangement in which two parties to a transaction may maintain silence in order to navigate the stronger position, and are under no obligation to divulge information which may weaken that position." *Id.* at 892-93. The court further found that "a duty to reveal fully and accurately all available non-identifying information about [an adoptive] child [wa]s consistent with the intent of [the Pennsylvania] legislature" as expressed through statutes requiring adoption agencies to disclose all information they had obtained about the adoptive child. *Id.* at 892.

As here, the plaintiffs in *Gibbs*, in addition to asserting claims for negligent misrepresentation, also asserted "a cause of action for failing to investigate [the adopted child's] mental and physical health." *Id.* at 893. With regard to that claim, the *Gibbs* court found that neither the common law nor the Pennsylvania statutes provided authority for recognizing a duty of investigation. *Id.* at 893-94. According to the court, "only where adoption intermediaries disclose information negligently will they be liable." *Id.* Specifically, the court found that "although the [Pennsylvania statute] requires a good faith effort to obtain medical history information on the part of adoption intermediaries, the requirement of a comprehensive investigation into the background of a child in order to avoid liability would strain the resources of adoption intermediaries and reduce the number of adoptions." *Id.* at 894. The *Gibbs* court thus concluded that the plaintiffs could

not "proceed to trial on the theory of breach of a duty to investigate as set forth in [the complaint]."[8]  *Id.*

In *Madison v. Bethanna, Inc.*, the court applied *Gibbs* to find that an adoption agency has a duty to fully and accurately disclose all non-identifying information in its possession regarding an adoptive child and must "make a 'reasonable effort' to determine the accuracy of its representations."[9]  No. CIV.A. 12-01330, 2012 WL 1867459, at *9 (E.D. Pa. May 23, 2012).  The court found that plaintiffs plausibly alleged a violation of that duty by alleging that the adoption agency "could have discovered the accuracy of . . . information [regarding the adoptive child's history of sexual abuse and mental condition] upon a simple investigation."  *Id.*  Similarly, in *Harshaw v. Bethany Christian Servs.*, the Court relied upon *Gibbs* and decisions from other jurisdictions to find that "the Virginia Supreme Court would likely . . . recognize an adoption agency's common-law duty to use

---

[8] Notably, although the *Gibbs* decision makes clear that an adoption agency does not have the duty to conduct "a comprehensive investigation into the background of a child," 647 A.2d at 894, the decision indicates that adoption agencies may have some lesser duty of investigation.  *See id.* at 890 (noting that party may be liable for negligent misrepresentation where it "fail[s] to make reasonable investigation of the truth" of its representation), 891 (finding that adoption agency is required to "make *reasonable* efforts to determine if their statements are true").

[9] In *Ferenc v. World Child, Inc.*, the court found that *Gibbs* and similar decisions from other jurisdictions "hold that there is a common law duty imposed upon adoption agencies to investigate the background of prospective adoptees with reasonable care and to fully inform their client adoptive parents of the results."  977 F. Supp. 56, 60 (D.D.C. 1997), *aff'd*, 172 F.3d 919 (D.C. Cir. 1998).  The *Ferenc* court found that such duty "originates . . . in the contractual relationship between the parents and the agency, and its scope may, by agreement of the parties, be varied by the terms of the contract."  *Id.*  Because the parties' contract in that case "clearly diminish[ed] [the adoption agency's] investigatory responsibility to an absolute minimum" and was "rife with cautionary language respecting the 'risk' of foreign adoptions," the court found that the adoption agency had not breached any duty of investigation.  *Id.*

reasonable diligence to obtain and disclose medical records and information to prospective adoptive parents."[10]  714 F. Supp. 2d 771, 800 (W.D. Mich. 2010).

Given this lack of consensus regarding the existence and scope of an adoption agency's duty to investigate, the Court finds that the determination of the precise scope of the duty CCAI owed Plaintiffs is best determined with the benefit of a fuller evidentiary record after the parties have engaged in discovery.  The Colorado Supreme Court has instructed that the determination of whether the law imposes a duty "requires consideration of many factors including, for example, the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor."  *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987) (quotation omitted).  A court's "conclusion that a duty does or does not exist is an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection."  *Id.* (quotation omitted).  Here, the parties have not briefed any of the factors identified by the Colorado Supreme Court or engaged in a significant discussion of the policy considerations,[11] and, regardless, the

---

[10] Other courts have considered but refused to resolve whether or not an adoption agency owes a duty of investigation to prospective adoptive parents.  *See, e.g., Dresser*, 358 F. Supp. 2d at 636 (noting that "the authorities are not uniform as to whether an adoption agency has a duty to investigate extensively and report on a child's medical history" but finding that it "need not resolve the question"); *Meracle*, 437 N.W.2d at 537 (finding that court "need not . . . address the question of whether adoption agencies have a duty to discover and disclose health information about children they place for adoption").

[11] For instance, neither party addresses the implication, if any, of Colorado's Rules and Regulations for Child Placement Agencies on the existence and scope of any duty an adoption agency owes to potential adoptive parents.  *See* 12 Colo. Code Regs. § 2509-8:7.710.  Section 2509-8:7.710.58 provides that "[a]vailable information shall be obtained on each child for adoption," including, but not limited to, "[a] history of the child" and "[a] social history of the child's birth family."  Although CCAI states generically in a footnote

Court believes that adequate consideration of the factors and policy considerations in this novel and important area of the law, requires a fuller factual record. *See, e.g.*, *Jacque ex rel. Dyer v. Pub. Serv. Co. of Colo.*, 890 P.2d 138, 140 (Colo. App. 1994) (finding that determination of legal duty "depends on the facts of each case and how the factors are balanced to determine whether a legal duty exists"); *Lewis v. Powers*, No. 15-CV-02692-MEH, 2017 WL 1023376, at *7 (D. Colo. Mar. 15, 2017) (denying motion for summary judgment because "the parties d[id] not provide sufficient information by which the Court may analyze the public policy factors and determine whether [defendant] owes [plaintiff] a legal duty of care"); *see also Greiman v. Hodges*, 79 F. Supp. 3d 933, 945–46 (S.D. Iowa 2015) ("Case law and legal commentators both encourage the denial of Rule 12(b)(6) motions where novel or unique theories are presented."); *Woolford v. City of Ashland*, No. 2:20-CV-04105-NKL, 2020 WL 5118049, at *4 (W.D. Mo. Aug. 31, 2020) (collecting cases for same proposition).

At this stage of the proceedings, the Court thus concludes that Plaintiffs have plausibly alleged that CCAI owed Plaintiffs a duty of care to conduct a reasonable

---

that "existing state and/or federal regulations . . . do not create a private cause of action" [#41 at 14 n.9], the parties do not address whether the Colorado rules and regulations may nonetheless assist in defining any common law duty. *See, e.g.*, *Gibbs*, 647 A.2d at 892 (examining state disclosure requirements to find that "a duty to reveal fully and accurately all available non-identifying information about a child is consistent with the intent of [the] legislature"); *Dresser*, 358 F. Supp. 2d at 641 (E.D. Mich. 2005) (finding that, although disclosure statute may not apply to defendant agency, it "nonetheless . . . made clear [the legislature's] preference for disclosure" and supported finding that agency had "legal duty to furnish the adopted child's medical information within its control or reasonably available to it to the new parents"); *cf. Garrett v. Land W. Ventures, Inc.*, No. 06-CV-01358-PSF-CBS, 2007 WL 2071615, at *4 (D. Colo. July 19, 2007) (finding that hunting statute "simply codifie[d] an existing common law duty to exercise reasonable care in a specific context, and the fact that the legislature chose not to impose civil liability for violations of [the statute] d[id] not foreclose such liability").

investigation into L's background and J's medical history and that CCAI breached that duty by failing to conduct such an investigation and thereby failing to obtain and disclose allegedly readily-available information concerning L's history of sexual abuse and J's medical history.[12]  [*See, e.g.*, #38, ¶¶ 52, 59, 102, 103, 104, 132, 133, 134, 142, 143] Ultimately, however, Plaintiffs will be required to prove, with evidence, the existence and scope of the duty allegedly breached by CCAI.

### 2.    Proximate Cause

CCAI next argues that Plaintiffs' negligence claims fail, because Plaintiffs have not plausibly alleged that CCAI's negligence was the proximate cause of their injuries.  [#41 at 15-16]  With respect to Plaintiffs' negligence claim based upon CCAI's alleged failure to investigate and fully disclose J's medical history, including the fact that J had surgery to remove a brain tumor in 2011 [#38, ¶ 58], CCAI argues that Plaintiffs fail to plausibly allege "how it would have been reasonably foreseeable to CCAI that [J going blind] could flow from a failure to investigate and disclose [J's full medical history], as opposed to simply reporting to the Martins each of the prior diagnoses at issue[ ]."  [#41 at 15-16] Accepting all allegations as true and drawing all reasonable inferences in favor of

---

[12] In their Motion, CCAI argues that, even if the Court finds a duty, the allegations are insufficient to allege a breach of any such duty. [#41 at 14-15] Specifically, CCAI argues that the allegations in the Second Amended Complaint acknowledge that CCAI investigated J's medical condition in that it identified J's specific medical conditions and followed-up with the orphanage regarding the scar on J's head.  [*Id.*]  The Second Amended Complaint alleges, however, that information regarding the medical surgery that caused the scar on J's head was not disclosed by CCAI and CCAI conducted no reasonable investigation into the cause even after Ms. Martin further inquired after CCAI checked with the orphanage.  [*See, e.g.*, #38, ¶¶ 51, 52, 59]  With regard to L, CCAI addresses only the allegation that it did not properly inquire into L's age and does not address the allegations that it failed to reasonably investigate L's sexual history, including by directly asking L. [*See* #41 at 14-15; #38, ¶¶ 103, 104]

Plaintiffs, the Court finds that Plaintiffs have plausibly alleged that it should have been reasonably foreseeable to CCAI that its failure to investigate and fully disclose J's medical history, including the fact that he had brain surgery, may result in J suffering additional negative health consequences.  To the extent CCAI's argument is based upon a contention that it was not reasonably foreseeable that its alleged negligence would result in the specific injury alleged (*i.e.*, loss of eyesight), "[u]nder Colorado law, . . . 'it is not necessary that [a tortfeasor] be able to ascertain precisely when or how an incident will occur'" but instead, "the test is whether the defendant reasonably should have anticipated *any* injury."  *Elliot v. Turner Const. Co.*, 381 F.3d 995, 1006 (10th Cir. 2004) (emphasis in original) (quoting *HealthONE v. Rodriguez*, 50 P.3d 879, 889 (Colo. 2002)).  "[I]n order for an injury to be a foreseeable consequence of a negligent act, it is not necessary that the tortfeasor be able to foresee the exact nature and extent of the injuries or the precise manner in which the injuries occur, but only that some injury will likely result in some manner as a consequence of his negligent acts."  *HealthONE*, 50 P.3d at 889.  The Court finds the allegations in the Second Amended Complaint sufficient to plausibly allege that additional health complications were a foreseeable consequence of CCAI's alleged failure to investigate and fully disclose J's medical history.

With respect to Plaintiffs' negligence claim based upon CCAI's alleged failure to investigate L's background and disclose that L (1) "had a history of sexual abuse" and (2) "was older than he really was" [#38, ¶ 143], CCAI argues only that "it cannot be said that the alleged inaccuracies concerning [L's] age could have plausibly triggered a natural and probable sequence of events leading to the tragic rapes of the Martins' adopted children, or the subsequent emotional and pecuniary damages resulting therefrom."  [#41 at 16]

CCAI thus makes no argument that Plaintiffs failed to plausibly allege proximate cause based upon CCAI's alleged failure to investigate and disclose L's history of sexual abuse. To the extent CCAI had made such an argument, the Court would find it unpersuasive at this stage of the proceedings.  Accepting all allegations as true and drawing all reasonable inferences in favor of Plaintiffs, the Court finds the allegations in the Second Amended Complaint sufficient to plausibly allege that L's sexual abuse of his adoptive brothers (and the damages that resulted therefrom) were a reasonably foreseeable consequence of CCAI's alleged failure to investigate and fully disclose L's history of sexual abuse.  *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 468-69 (2008) (Alito, J., *dissenting*) (noting "correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness," including that "[v]ictims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes"); *J.S. v. R.T.H.*, 714 A.2d 924, 933 (N.J. 1998) ("An especially disturbing finding about child sexual abuse is its strong intergenerational pattern; in particular, due to the psychological impact of their own abuse, sexually abused boys have been found to be more likely than non-abused boys to turn into offenders against the next generation of children.").

To the extent Plaintiffs' negligence claim is premised upon CCAI's failure to investigate and disclose L's actual age, however, the Court agrees that Plaintiffs have failed to plausibly allege that their injuries were proximately caused by that failure. Plaintiffs simply allege that if CCAI had accurately represented L's age, the Martins would not have adopted him.  [#38, ¶ 101]  Indeed, in their response to the Motion, Plaintiffs identify every fact that they believe support causation, and the only causation fact related

to the misrepresentation concerning L's age is the fact that the Martins would not have adopted L had they known his age.[13]  [#45 at 15-18]  That allegation, however, goes to actual, or "but for" cause—not proximate cause.  Plaintiffs allege no facts suggesting it would have been reasonably foreseeable to CCAI that its failure to properly investigate and disclose L's age would have resulted in L raping his adoptive brothers.  Accordingly, the chain of causation between CCAI stating that L was three to four years younger than his actual age, and L's subsequent abuse of his brothers, is too attenuated to plausibly allege proximate cause.

### 3.    Conclusion

Based upon the above discussion, the Court finds that, at this stage of the proceedings, Plaintiffs have plausibly alleged negligence claims against CCAI based upon CCAI's alleged failure to (1) investigate and disclose J's medical history and (2) investigate and disclose L's history of sexual abuse, and the Motion thus is DENIED with respect to those negligence claims.  To the extent Plaintiffs assert a negligence claim based upon CCAI's failure to investigate and disclose L's actual age, however, the Court finds that Plaintiffs have failed to plausibly allege that such negligence proximately caused their damages, and the Motion thus is GRANTED to the extent it seeks to dismiss that negligence claim.

---

[13] Although Plaintiffs also contend that L's actual age "is important in the determination of how long [L's] history of sexual abuse could be" [#45 at 16], it is the details of L's history of sexual abuse (which may or may not have revealed his actual age) that Plaintiffs are arguing support a finding of causation.

### D.    Negligent Misrepresentation Claims

To state a claim for negligent misrepresentation, a plaintiff must plausibly allege that "(1) [the defendant] supplied false information in a business transaction; (2) it failed to exercise reasonable care or competence in obtaining or communicating that information; and (3) [the plaintiff] justifiably relied upon the false information."[14]  *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009) (quoting *Campbell v. Summit Plaza Assocs.*, 192 P.3d 465, 477 (Colo. App. 2008)).

Courts in this Circuit have held that when a plaintiff's negligent misrepresentation claims are grounded in fraud, those claims must meet the more stringent standards of Federal Rule of Civil Procedure 9(b), which requires a party to "state with particularity the circumstances constituting fraud." S*ee, e.g.*, *Heaton v. Am. Brokers Conduit*, 496 F. App'x 873, 876 (10th Cir. 2012) (affirming district court's determination that plaintiff "fatally failed to plead his fraud and negligent misrepresentation claims with particularity as required by [Rule] 9(b)"); *Hardy v. Flood*, No. 17-cv-00677-CMA-MJW, 2018 WL 1035085, at *3 (D. Colo. Feb. 23, 2018) ("Any claim—including claims for breach of contract and negligent misrepresentation—may be subject to Rule 9(b)'s heightened pleading standard if the claim is grounded in fraud."  (quotation omitted)) (citing cases).  To meet the particularity

---

[14] The Colorado model jury instruction for a negligent misrepresentation claim includes the following seven elements:  (1) "[t]he defendant gave false information to the plaintiff;" (2) "[t]he defendant gave such information to the plaintiff in the course of" a business transaction; (3) "[t]he defendant gave the information to the plaintiff for the [guidance or use] of the plaintiff in a business transaction;" (4) "[t]he defendant was negligent in obtaining or communicating the information;" (5) "[t]he defendant gave the information with the intent or knowing that [the plaintiff] would [act or decide not to act] in reliance on the information;" (6) "[t]he plaintiff relied on the information supplied by the defendant;" and (7) "[t]his reliance on the information supplied by the defendant caused damage to the plaintiff."  CJI-CIV 9:4 (2020).

requirements of Rule 9(b), Plaintiffs must "set forth the time, place and contents of the false representation[s], the identity of the party making the false statements and the consequences thereof." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016) (quotation omitted).

### 1.    Negligent Misrepresentation Claim Related to L

Plaintiffs allege that CCAI negligently misrepresented L's age and negligently failed to disclose information about L's background and previous sexual abuse. [#38, ¶¶ 114-20]  Specifically, with regard to L's age, Plaintiffs allege that CCAI "[i]nform[ed] the Martins that [L] was twelve-years-old rather than his actual age of fifteen or sixteen years of age." [*Id.* at ¶ 116(b)]  Plaintiffs include no non-conclusory allegations, however, as to how CCAI "failed to exercise reasonable care or competence in obtaining or communicating" information about L's age.  *Alpine Bank*, 555 F.3d at 1106.  As CCAI argues, Plaintiffs have failed to plausibly allege that CCAI possessed knowledge or materials that would (or should) have led it to believe that the representations about L's age were false.[15] [#41 at 8-10]  Instead, Plaintiffs' allegations amount only to conclusory statements that "[h]ad CCAI conducted a scintilla of independent investigation, they would have known [L's] correct approximate age."  [#38, ¶ 31]  But the Second Amended Complaint fails to identify what investigation CCAI should have undertaken and how that investigation could have revealed L's true age.  Indeed, the Second Amended Complaint

---

[15] Although Plaintiffs allege that "CCAI did no investigation into [L's] age" [#38, ¶ 32], elsewhere they allege that CCAI "provided paperwork to the Martins showing that [L] was twelve years old" at the time of the adoption [*id.* at ¶ 29].  Plaintiffs do not allege that CCAI falsified that paperwork , that CCAI knew that the paperwork was inaccurate, or otherwise plausibly allege why it was unreasonable for CCAI to rely upon the paperwork in representing L's age to the Martins.

makes clear that, to this day, the Martins themselves do not know L's true age.  [*Id.* at ¶ 30 (stating that L "was at least 15-16 years old" at the time of his adoption)]  Plaintiffs' conclusory statements concerning CCAI's failure to exercise reasonable care or competence in obtaining or communicating information about L's age thus fail to state a claim for negligent misrepresentation.  *See, e.g.*, *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 564 n.10.

With regard to L's background and history of sexual abuse, the Second Amended Complaint does not allege that CCAI made any affirmative statements to Plaintiffs.[16] [*See generally* #38; *see also* #45 at 6-9 (detailing the allegations supporting the negligent misrepresentation claim related to L)]  Instead, Plaintiffs allege only that CCAI "failed to exercise reasonable care or competence in *obtaining*" information regarding L's background and history of sexual abuse.  [*Id.* at ¶¶ 117, 118 (emphasis added)]  Thus, preliminarily, the Court must determine whether a negligent omission can support a negligent misrepresentation claim.

The Colorado Supreme Court has not determined whether a negligent misrepresentation claim can be premised on an omission or nondisclosure.  *See, e.g.*, *Leprino Foods Co. v. DCI, Inc.*, 727 F. App'x 464, 472 n.5 (10th Cir. 2018) ("[I]t is unclear whether a claim for negligent nondisclosure is viable *at all* in Colorado."); *Cahey v. Int'l Bus. Machines Corp.*, No. 20-CV-00781-NYW, 2020 WL 5203787, at *8 (D. Colo. Sept.

---

[16] Plaintiffs generically allege that CCAI provided "incomplete and inaccurate representations of [L's] past" and "[d]isclos[ed] as little as possible regarding [L's] background" [#38, ¶¶ 105, 116(a)], but fail to identify any affirmative statements CCAI actually made about L's background.  Plaintiffs' conclusory allegations are insufficient to state a claim under *Twombly*, let alone the heightened pleading standard required by Rule 9(b).  *See* 550 U.S. at 555.

1, 2020) ("[T]he Colorado Supreme has not determined whether a negligent misrepresentation claim can be premised on an omission or nondisclosure."); *Lynch*, 2019 WL 23272841, at *18 (noting that whether a negligent misrepresentation claim can be premised on an omission "is an unsettled area of law" but declining to make an *Erie* guess because defendants raised the argument for the first time in a reply brief); *Aurzadniczek v. Humana Health Plan, Inc.*, No. 15-cv-00146-RM-KMT, 2016 WL 9735775, at *4 (D. Colo. Feb. 23, 2016) ("The Colorado Supreme Court has never adopted a claim for negligent non-disclosure or negligent omission as distinct from negligent affirmative misrepresentations or fraudulent omission or concealment."), *recommendation adopted in part, rejected in part on other grounds*, 2016 WL 1266972 (D. Colo. Apr. 1, 2016); *Scott v. Honeywell Int'l Inc.*, No. 14-cv-00157-PAB-MJW, 2015 WL 1517527, at *11 n.10 (D. Colo. Mar. 30, 2015) ("It is not entirely clear that plaintiff can maintain a negligent misrepresentation claim based upon defendant's omissions.") (collecting cases); *Sheffied Servs. Co. v. Trowbridge*, 211 P.3d 714, 725 (Colo. App. 2009) (noting that whether Colorado law even recognized a claim of negligent nondisclosure is uncertain, but assuming without deciding that it did), *overruled on other grounds by Weinstein v. Colborne Foodbotics, LLC*, 302 P.3d 263 (Colo. 2013). Thus, as explained above, because the Colorado Supreme Court has not resolved this question, this Court must make an *Erie* guess as to how that court would rule. *Lynch*, 2018 WL 5619327, at *6. In doing so, the Court "look[s] to decisions of the state court of appeals as strongly persuasive, if not governing, authority as to how the state supreme court would rule." *Id.* (citing cases); *see also Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1230 (10th Cir. 2000) ("[T]his court must . . . follow any intermediate state court decision unless other

authority convinces us that the state supreme court would decide otherwise." (quotation omitted)).

While the Colorado Supreme Court has not explicitly determined whether an omission can give rise to a negligent misrepresentation claim, it has made clear that "[t]o establish a claim for negligent misrepresentation, it must be shown that the defendant *supplied false information* to others in a business transaction." *Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.*, 892 P.2d 230, 236 (Colo. 1995) (emphasis added); *see also* CJI-CIV 9:4 (2020) (Colorado model jury instructions describing the elements of a negligent misrepresentation claim to require, *inter alia*, that "defendant *gave* false information to the plaintiff" and that "plaintiff relied on the information *supplied by* the defendant" (emphasis added)). The weight of authority from the Colorado Court of Appeals also indicates that a negligent misrepresentation claim must be premised on affirmative statements, rather than omissions. *See, e.g.*, *Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1167 (Colo. App. 2010) (holding that a negligent misrepresentation claim "must focus on what [defendant] affirmatively represented, not what it failed to disclose" (quotation omitted)); *Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 31 (Colo. App. 2010) ("[A]lthough we have concluded that nondisclosure . . . could support a fraud claim, our analysis [of the negligent misrepresentation claim] is limited to what [defendant] affirmatively represented, not what it failed to disclose."); *see also Creighton v. Forest City Stapleton Inc.*, No. 09CV8482, 2011 WL 6120219 (Colo. Dist. Ct. July 7, 2011) ("Colorado law has not recognized the Plaintiffs' claim of negligent nondisclosure or concealment."). *But see Mullen v. Allstate Ins. Co.*, 232 P.3d 168, 174 (Colo. App. 2009) (considering but denying negligent misrepresentation by omission

29

claim on the grounds that insurer was not obligated to provide information about other types of coverage); *Hoang v. Arbess*, 80 P.3d 863, 867-69 (Colo. App. 2003) (reversing directed verdict and finding plaintiff had presented sufficient evidence of defendant's involvement in the negligence claims—including a negligent nondisclosure and concealment claim—based on evidence that defendant approved of, directed, and actively participated in the negligent conduct).  Based upon this precedent, several courts in this District have concluded that Colorado law does not recognize a claim for negligent misrepresentation based upon nondisclosure or concealment.  *See, e.g.*, *Cahey*, 2020 WL 5203787, at *8 (concluding "that the weight of intermediate Colorado court decisions decline to find a viable claim for negligent misrepresentation based on an omission, and no other authority persuades this court that the Colorado Supreme Court would find otherwise"); *Craig Hosp. v. Tyson Foods, Inc.*, No. 17-CV-02534-REB-STV, 2019 WL 5095737, at *7 (D. Colo. July 22, 2019) (concluding "that the Colorado Supreme Court would require that a negligent misrepresentation claim be grounded in affirmative statements"); *Haney v. Castle Meadows, Inc.*, 839 F. Supp. 753, 756 (D. Colo. 1993) (interpreting Colorado state law and concluding that "there is no tort for negligent concealment in the vendor/purchaser context," and interpreting the claims as asserting fraudulent concealment, because "the seller's knowledge of the [latent] condition is an essential element of a claim based on concealment," and therefore "the case becomes one sounding in fraud, not negligence").  *But see Cent. Masonry Corp. v. Bechtel Nat'l, Inc.*, 857 F. Supp. 2d 1160, 1163-64 (D. Colo. 2012) (finding that a nondisclosure or concealment claim based on alleged negligence "would be analyzed as a claim for negligent misrepresentation" under Colorado law, and noting that "concealment suggests

affirmative acts while nondisclosure connotes inaction despite a duty");[17] *Aurzadniczek v. Humana Health Plan, Inc.*, No. 15-CV-00146-RM-KMT, 2016 WL 9735775, at *4 (D. Colo. Feb. 23, 2016) (stating that "[s]ince the issue i[s] unclear, this court, at this stage of the litigation, will assume a viable claim could be found to exist for negligent non-disclosure as analyzed under a negligent misrepresentation analysis" but finding that plaintiff failed to allege any "omission of information that would convey a false statement"), *recommendation adopted in part, rejected in part on other grounds*, 2016 WL 1266972 (D. Colo. Apr. 1, 2016).

Based on the foregoing authority, the Court concludes that the Colorado Supreme Court would require that a negligent misrepresentation claim be grounded in affirmative statements. Because Plaintiffs do not allege that CCAI made any affirmative misrepresentation about L's background or history of sexual abuse [*see generally* #38], Plaintiffs have failed to state a claim for negligent misrepresentation based upon CCAI's alleged failure to "exercise reasonable care or competence in obtaining and communicating [L's] . . . horrendous sexual abuse [and background] to the Martins."  [#38, ¶ 117]

Accordingly, the Court GRANTS the Motion to the extent it seeks to dismiss Claim One.

---

[17] Notably, although *Central Masonry Corp.* cites to *Colorado Coffee Bean, LLC*, it does not address the Colorado Court of Appeals' decision to limit its consideration of the negligent misrepresentation claim in that case "to what [the defendant] affirmatively represented, not what it failed to disclose."  *See Central Masonry Corp.*, 857 F. Supp. 2d at 1164; *Colorado Coffee Bean, LLC*, 251 P.3d at 31.

### 2.   Negligent Misrepresentation Claim Relating to J

With respect to J, the only affirmative representations identified in the Second Amended Complaint are: (1) CCAI employees represented that J had a diagnosis of hydrocephalus and cerebral palsy [#38, ¶ 43]; (2) Ms. Winger told the Martins that the orphanage said that J had not had surgery [*id.* at ¶ 49]; and (3) Ms. King told the Martins not to contact any organization other than the orphanage as "doing so could harm [CCAI's] operations in China" [*id.* at ¶ 54].  The Second Amended Complaint, however, does not allege that any of these statements were misrepresentations and Plaintiffs' negligent misrepresentation claim does not refer to any of them.  [*See, e.g.*, *id.* at ¶¶ 122-30]  Although the Second Amended Complaint alleges that J did, in fact, have surgery [*id.* at ¶ 58], it does not allege that Ms. Winger's statement to the Martins was untrue—*i.e.*, the Second Amended Complaint does not allege that the orphanage did not, in fact, tell CCAI that J had not had surgery [*id.* at ¶ 49].  Importantly, the Second Amended Complaint does not allege that CCAI made an affirmative representation that J had not had surgery as distinct from Ms. Winger's statement that the orphanage told CCAI that J had not had surgery.  Thus, the Second Amended Complaint does not allege that CCAI made any affirmative misrepresentations about J.[18]

Instead, Plaintiffs' negligent misrepresentation claim is based upon CCAI's alleged failure to obtain and communicate information about J's medical history by "[c]ontacting [J's] orphanage for background information" and "[o]btaining contact information for non-

---

[18] Although Plaintiffs' negligent misrepresentation claim vaguely refers to "CCAI's representations regarding both [J's] health and the adequacy of [CCAI's] investigation into it" [*id.* at 127], Plaintiffs fail to identify any specific representations CCAI made about J's health or CCAI's investigation into J's health that were not accurate.

profits and hospitals that assist in care of orphans in China." [#38, ¶ 126; #45 at 9-12] For the reasons explained above, however, the Court concludes that a negligent misrepresentation claim in Colorado must be premised upon affirmative misrepresentations, not omissions. Accordingly, because the Second Amended Complaint fails to allege an affirmative misrepresentation that CCAI made about J's health, the Motion is GRANTED with respect to Claim Two.

### E.    Fraud claims

Finally, CCAI moves for the dismissal of Plaintiffs' fraud claims, arguing that Plaintiffs have not plausibly pled such claims. [#45 at 16-20] In Plaintiffs' response, Plaintiffs concede that they did not plead sufficient facts to assert a fraud claim. [#45 at 23] Accordingly, the Motion is GRANTED to the extent it seeks to dismiss Claims Five and Six.

### F.    Fees

CCAI requests that it be awarded reasonable attorney's fees for defending this action pursuant to Colorado Revised Statute § 13-17-201. [#48 at 13-14] Section 13-17-201 provides:

> In all actions brought as a result of a death or an injury to person or property occasioned by the tort of any other person, where any such action is dismissed on motion of the defendant prior to trial under rule 12(b) . . . , such defendant shall have judgment for his reasonable attorney fees in defending the action.

"By its plain text, Section 13-17-201 only requires an award of attorneys' fees where a court dismisses the entire action." *Hardy v. Flood*, No. 17-CV-00677-CMA-NRN, 2019 WL 764484, at *3 (D. Colo. Feb. 21, 2019). Because the Court finds that certain of Plaintiffs' negligence claims survive CCAI's Motion, Section 13-17-201 does not apply

and CCAI is not entitled to an award of attorney's fees.  Accordingly, the request for fees is DENIED.

## IV.    CONCLUSION

For the foregoing reasons, CCAI's Motion to Dismiss [#41] is **GRANTED IN PART** and **DENIED IN PART,** as follows:

(1)    The Motion is **GRANTED** to the extent it seeks dismissal of Plaintiffs' negligent misrepresentation claims (Claims One and Two), Plaintiffs' fraud claims (Claims Five and Six), and Plaintiffs' negligence claim (Claim Four) to the extent that claim is based upon CCAI's failure to investigate and disclose L's actual age and those claims are hereby **DISMISSED**;

(2)    The Motion is **DENIED** to the extent it seeks to dismiss Plaintiffs' negligence claims (Claims Three and Four) based upon CCAI's alleged failure to (1) investigate and disclose J's medical history and (2) investigate and disclose L's history of sexual abuse, and the Motion thus is **DENIED** to the extent it requests an award of attorneys' fees; and

(3)    The Stay of Discovery in this matter [#24] is hereby **LIFTED**. The status conference set for December 17, 2020 at 9:15 a.m. is converted to a Scheduling Conference.  The parties shall file a Proposed Scheduling Order no later than December 10, 2020.

DATED: November 10, 2020                BY THE COURT:

                                                         s/Scott T. Varholak
                                                         United Stated Magistrate Judge